# Deposit Bank of Owensboro v. Daveiss County, Etc.
## Farmers & Traders Bank v. City of Owensboro.
## Owensboro Savings Bank v. Same.
## Citizen's Saving Bank v. Same.
## Deposit Bank v. Same.
## City of Carlisle v. Deposit Bank.
## Same v. Farmers' Bank.
## Nicholas County v. Deposit Bank.
## Simpson County Bank v. City of Franklin.

THE FIRST FIVE APPEALS FROM THE DAVEISS CIRCUIT COURT; THE NEXT THREE FROM THE NICHOLAS CIRCUIT COURT, AND THE LAST-NAMED FROM THE SIMPSON CIRCUIT COURT.

1. CHARTER OF CORPORATIONS—RIGHT TO REPEAL—CONTRACTS.— Whenever the Legislature granting a charter reserves the right to amend or repeal it, either so providing in the charter, or by

---

\*This opinion has not been sooner reported because pending an appeal to the United States Supreme Court, where it was affirmed except as to taxation of shares in National Banks. See the opinion 173 U. S., 636.

Deposit Bank of Owensboro v. Daveiss County, etc.

general law, the right to amend or repeal the same exists, and is not an impairment of the obligation of a contract, the charter having been accepted with the full understanding that the right to repeal it is part of the contract, and to the exercise of which right the grantee has consented. Therefore the charters of banks in this State so granted or extended after the passage of the act of 1856, which provided that all charters and grants to corporations, or amendments thereof, were to be subject to amendment or repeal at the will of the Legislature, unless a contrary intent be plainly expressed therein, are subject to such amendment or repeal at the will of the Legislature, there being nothing in such charters, or amendments, indicating a legislative intent that they were not to be subject to such repeal or amendment.

2. TAXES—CONTRACTS, IMPAIRMENT OF.—Where under the provisions of the Hewitt bill of 1886, the provisions of which were accepted by the banks, banks were required to pay taxes at the rate of 75 cents on each share of $100 value, in full of all State, county and municipal taxes, and it was subsequently provided by section 174 of the Kentucky Constitution that all property, whether owned by natural persons or corporations, shall be taxed in proportion to its value, and that all corporate property shall bear the same rate of taxation as individual property, and pursuant thereto by an act of the Legislature taxes were levied on the shares of the capital stock of the banks for county and municipal purposes, and by statute the rate for State purposes was reduced from 75 cents on each share of $100 value to 42½ cents, (the same rate as on individual property), the privilege which the banks enjoyed under the Hewitt bill of paying 75 cents on each share of stock of $100 in value in lieu of all other taxes was repealed, and the property of the banks thereby became subject to taxation for State, county and municipal purposes at the same rate as property of individuals and other corporations; by this action of the Constitution and the subsequent Legislature there was no impairment of the obligation of a contract.

3. NATIONAL BANKS—TAXATION.—The State may tax shares of stock in a national bank for State, county and municipal purposes at their actual value, but no greater rate of taxation shall be collected on them than is assessed upon the moneyed capital in the hands of individual citizens of the State.

4. VESTED RIGHTS.—The provisions of the act of 1856 that while privileges and franchises may be repealed or amended, no

amendment or repeal shall impair "rights previously vested," refers to such rights as the beneficiaries under the charter or general laws may have in property, contracts, choses in action, real or personal property, or any other interest which they could acquire in operating under the charter or law; but does not embrace privileges and franchises granted by the State, which may be withdrawn or changed at the will of the Legislature.

5. TAXATION OF DEPOSITS.—Banks are not required to pay taxes on money deposited with them by their customers, or on assets representing it; by reason of the particular character of their business they are *quasi* trustees of the depositors who are required under the law to pay a tax on the money so deposited.

SWEENEY, ELLIS & SWEENEY FOR THE OWENSBORO SAVINGS BANK, DEPOSIT BANK OF OWENSBORO, AND FARMERS AND TRADERS BANK.

1. Where there is a grant of privileges and franchises to a corporation in consideration of a *bonus* to the State, and there are words which manifest an intention upon the part of the State to relinquish the right of taxation, there is a contract which can not be changed or altered by subsequent legislation. Franklin County Court v. Deposit Bank of Frankfort, 87 Ky., 370; Farmers' Bank v. Commonwealth, 6 Bush, 127; N. J. v. Yard, 5 Otto; Greenwood v. Union Freight R. R. Co., 105 U. S., 13; Maine Central R. R. Co. v. Maine, 5 Otto.

2. Incorporation of the act of 1856 as part of the contract made between the banks and the State under the provisions of the Hewitt bill can not have the effect of nullifying the plain language of the latter; the act is to be considered as a whole, and when the court finds a plain intent to exempt from further taxation, plainly and unequivocally expressed, it must consider any reservations of power as applying to other legislative enactments which will not contradict the agreement in respect to the right of taxation. N. J. v. Yard, 5 Otto.

3. The Hewitt law should be considered as a general amendment to the charters of all banks who might accept provisions of the same; and surely an agreement on the part of the State to surrender the right of further taxation, plainly and unmistakably surrendered, can not have a proviso inserted by construction to the effect that the Legislature nevertheless retains the right of further taxation. State Bank of Ohio v. Knoop, 16 Howard, 369; Dodge v. Woolsey, 18 Howard, 331.

4. The questions presented in these appeals have been decided by

this court (Bank tax cases, 97 Ky., 590). And the Supreme Court of the United States has held the same way in the cases of Bank of Commerce v. Tenn., 163 U. S., 416.

HANSON KENNEDY FOR DEPOSIT BANK OF CARLISLE AND FARMERS BANK OF CARLISLE.

1. The contract rights of the banks have been settled by the opinion of this court in the bank tax cases (97 Ky., 590), and the people of the State have adjusted themselves to the same, and the doctrine of *stare decisis* should prevail.

2. Money paid under a mistake of law or fact may be recovered; and this is especially applicable where taxes have been paid under illegal taxation, because the tax payer has no voice in the imposition of the burden and has the right to presume that the power of taxation has been lawfully exercised. Gallatin v. Bradford, 1 Bibb, 209; Underwood v. Brockman, 4 Dana, 314-317; Ray v. Bank of Kentucky, 3 B. M., 513-514; Gratz v. Redd, 4 B. M., 190; City of Louisville v. Zanone, 1 Met., 151; McMurtry v. Ky. Cen. R. R. Co., 84 Ky., 462; Gibson v. Ky. Grangers' Mut. Ben. Soc., 8 Ky. Law Rep., 520; Montgomery v. Provance, 10 Ky. Law Rep., 635; Davezac v. Seiler, 12 Ky. Law Rep., 599; First Nat. Bank v. Behan, 91 Ky., 560; Clore & Sons v. Davis, 15 Ky. Law Rep., 399; Titus v. Rochester Ger. Ins. Co., 97 Ky., 567; City of Covington v. Powell, 2 Met., 226; City of Louisville v. Henning & Speed, 1 Bush, 381; City of Louisville v. Anderson, 79 Ky., 334; Fecheimer Bros. & Co., v. City of Louisville, 84 Ky., 307; Torbett, Trustee, v. City of Louisville, 9 Ky. Law Rep., 202; City of Newport v. Ringo's Ex'trix., 87 Ky., 635; L. & N. R. R. Co. v. Hopkins Co., 87 Ky., 605; L. & N. R. R. Co. v. Commonwealth, 89 Ky., 531; Trustees of Stanford v. Hite, 2 Ky. Law Rep., 386; City of Louisville v. Anderson, 79 Ky., 339.

3. If tax is paid voluntarily it can not be recovered, but if paid involuntarily it comes within the rule and may be recovered. If the property owner may be coerced by summary proceedings, such as the sale of property by the tax collector without judicial proceedings, or by fine against the owner, then the payment is not voluntary, but involuntary. Tyler v. Smith, 18 B. M., 799; City of Covington v. Powell, 2 Met., 229; City of Louisville v. Anderson, 79 Ky., 343; L. & N. R. R. Co. v. Hopkins Co., 87 Ky., 613; Southern Div. C. & O. R. R. Co. v. Marion Co., 11 Ky. Law Rep., 329; Mills' Guardian v. City of Hopkinsville, 11 Ky. Law Rep., 165; Fecheimer Bros. & Co. v. City of Louisville, 84 Ky., 307-308; City of Newport v. Ringo's Ex'trix., 87 Ky., 635.

[12]

4. In the absence of express legislative authority taxation can not be recovered by suit. Turnpike Commissioners v. L. & N. R. R. Co., 8 Ky. Law Rep., 348; Baldwin v. Hewitt, Auditor, 88 Ky., 673; Louisville Water Co. v. Commonwealth, 89 Ky., 244.

THOMAS OWENS FOR CITY OF CARLISLE.

1. The power of taxation is a sovereign power delegated by the people to their representatives to be exercised only for the benefit of the people at large; and is one which the Legislature can not divest itself of, and which can not be taken from it by implication.
2. The taxes were paid voluntarily by the banks into the State Treasury; no coercive measures were used by the city or could have been, for it had no power to coerce the collection of same. Kentucky Statutes, sec. 3629; L. & N. R. R. Co. v. Hopkins Co., 87 Ky., 605.
3. The city could not have recovered interest upon taxes from the banks, and interest should not have been adjudged against it upon the recovery of the taxes paid by the bank.

GOODNIGHT & ROARK FOR THE SIMPSON CO. BANK.

1. Appellant having in the past borne the burden of its contract with the city should now be allowed the benefits thereof. Bank tax cases, 97 Ky., 590.

G. T. FINN FOR THE CITY OF FRANKLIN.

1. Even under the decision of the court in the bank tax cases (97 Ky., 590), the Simpson County Bank, having been organized since the Hewitt law went into effect, can not claim a binding contract made and entered into for a consideration under the provisions of that act; it not then being in existence could not have surrendered anything under the provisions of that act.

WEIR & WEIR, R. A. MILLER AND WILFRED CARRICO, OF COUNSEL FOR THE OWENSBORO BANKS.

J. D. ATCHISON, L. P. LITTLE, W. G. DEERING AND G. A. CASSIDY FOR THE CITY OF OWENSBORO.

R. S. TODD FOR DAVEISS COUNTY.

B. H. ROBINSON FOR NICHOLAS COUNTY.

ROSS & SON AND HARRY KENNEDY OF COUNSEL FOR THE CARLISLE BANKS.

Deposit Bank of Owensboro v. Daveiss County, etc.

JUDGE PAYNTER DELIVERED THE OPINION OF THE COURT.

These cases were pending either in this or the lower courts when the cases known as the bank tax cases were decided. (97 Ky.)

From that opinion the writer of this one dissented in which Judges Lewis and Guffy concurred.

The questions of law involved in these cases are similar to those in cases mentioned. We therefore re-examine and reconsider the question as to whether the opinion of the majority shall stand as the law regulating the taxation of the banks of the State. The conclusion which we have reached is that the shares of stock, etc., in the banks are subject to county and municipal taxation, hence the opinion referred to should be and is overruled.

So is the case of Franklin County Court, etc., v. Deposit Bank of Frankfort, etc., 87 Kentucky, 370, overruled for the reasons which will hereinafter appear. The conclusion of the court renders it necessary to discuss the questions of law in the other "Bank Tax cases," and we will consequently use parts of the dissenting opinion without quotation marks. There were four banks in the State commonly designated as the "old banks," and they were the Bank of Kentucky, chartered in 1834, the Northern Bank in 1835, the Bank of Louisville in 18—, the Farmers' Bank of Kentucky in 1850. The charters of the first three banks named were extended by the same act of the General Assembly in 1858, and each of the charters were extended by subsequent legislative acts. In neither of the acts of extension is reference made to the act of 1856, nor does either contain express limitations upon the taxing powers of the State.

The charter and amendments of the Farmers' Bank ʼ
Kentucky were extended by an act of the General Assem-
bly in 1876, but the right to repeal the charter and its
amendments "either by general or special act" was re-
served in the act.

The charters of all banks operating under charters were
granted after the act of 1856. This was the situation when
the revenue bill of 1886, generally called the "Hewitt Bill,"
became a law.    The provision of it relating to the tax-
ation of banks is article 2, chapter 92, General Statutes, and
reads as follows:

Section 1. "That shares of stock in State and national
banks, and other institutions of loan or discount, and in all
corporations required by law to be taxed on their capital
stock, shall be taxed seventy-five cents on each share there-
of equal to one hundred dollars, or on each one hundred
dollars of stock therein owned by individuals, corporations
or societies, and said banks, institutions and corporations
shall, in addition, pay upon each one hundred dollars of so
much of their surplus, undivided surplus, undivided profits
or undivided accumulations as exceeds an amount equal to
10 per cent. of their capital stock, which shall be in full
of all tax, State, county and municipal."

*      *      *      *      *      *

Sec. 4. "That each of said banks, institutions and cor-
porations, by its corporate authority, with the consent of
a majority in interest of a quorum of its stockholders, at a
regular or called meeting thereof, may give its consent to the
levying of said tax, and agree to pay the same, as herein
provided, and to waive and release all right under the acts

of Congress, or under the charters of the State banks, to a different mode or smaller rate of taxation, which consent or agreement to and with the State of Kentucky shall be evidenced by writing under the seal of such bank, and delivered to the Governor of this Commonwealth; and upon such agreement and consent being delivered and in consideration thereof, such bank and its shares of stock shall be exempt from all other taxation whatsoever, so long as said tax shall be paid during the corporate existence of such bank."

Sec. 5. "The said banks may take the proceeding authorized by section 4 of this act at any time until the meeting of the next General Assembly: Provided, They pay the tax provided in section 1, from the passage of this act."

Sec. 7. "If any bank, State or national, shall fail or refuse to pay the tax imposed by this act, or shall fail or refuse to make the consent and agreement as prescribed in section 4, the shares of stock of such bank, institution or corporation, and its surplus, undivided accumulations and undivided profits shall be assessed as directed by section 2 of this act, and the taxes, State, county and municipal, shall be imposed, levied and collected upon the assessed shares, surplus, undivided profits, undivided accumulations, as is imposed on the assessed taxable property in the hands of individuals: Provided, That nothing herein contained shall be construed as exempting from taxation for county or municipal purposes any real estate or building owned and used by said banks or corporations for conducting their business, but the same may be taxed for county and municipal purposes as other real estate is taxed."

Sec. 6. "This act shall be subject to the provisions of section eight (8), chapter sixty-eight (68) of the General Statutes."

Section 8 of chapter 68, referred to in section 6 above is as follows: "All charters and grants of or to corporations or amendments thereof, enacted or granted since the 14th of February, 1856, and all other statutes shall be subject to amendment or repeal at the will of the Legislature, unless a contrary intent be therein plainly expressed: Provided, That whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested."

These statutes were in force when the constitutional convention met to frame the present Constitution. This instrument was adopted on the 28th day of September, 1891.

Section 174 is as follows: "All property, whether owned by natural persons or corporations, shall be taxed in proportion to its value, unless exempted by this Constitution; and all corporate property shall pay the same rate of taxation paid by individual property. Nothing in this Constitution shall be construed to prevent the General Assembly from providing for taxation based on income, license or franchise."

Section 175 provides: "The power to tax property shall not be surrendered or suspended by any contract or grant to which the Commonwealth shall be a party."

In pursuance to these provisions of the Constitution the General Assembly enacted laws under which the taxes were levied on the shares of the capital stock, etc., for county and municipal purposes, about the imposition of which these

controversies arose.   The General Assembly, by the laws
imposing the taxes for county and municipal purposes, re-
duced the amount which the banks had been paying the State
so as to only collect forty-two and one-half cents on each
one hundred dollars of the value of the property interest in
the bank assessed.   This is the rate of taxation paid by in-
dividual property.   The rate under the "Hewitt Bill" was
seventy-five cents on each share of the capital stock equal
to one hundred dollars or on each one hundred dollars of
stock therein; and in addition thereto, pay upon each one
hundred dollars of so much of their surplus, undivided sur-
plus, undivided profits or undivided accumulations as ex-
ceeded an amount equal to ten per cent. of their capital stock
which was in full of all tax, State, county and municipal.
We assume the banks filed their written consent as pro-
vided for in section 4 of article 2.

It is claimed that the banks have irrevocable contracts
with the State from which it can not recede without their
consent; that the constitutional convention and the State
had no power to change the mode or fix a higher rate of
taxation than was imposed in the act of 1886.

It is gravely asserted that when those who gave the State
its organic law and statutory law, seek to impose the burden
of taxation equally on those who should bear it, that a con-
tract is attempted to be violated and the State is acting in
bad faith.   We fully realize the wisdom of that provision of
the Federal Constitution, which declares that no State shall
pass any law "impairing the obligation of contracts."   The
State should deal honestly with its citizens, thus setting an
example worthy of the imitation of those who constitute
the State.

It has been well said, "A compact lies at the foundation of all national life. Contracts mark the progress of communities in civilization and prosperity. They guard, as far as is possible, against the fluctuations in human affairs. They seek to give stability to the present and certainty to the future. They gauge the confidence of man in the truthfulness and integrity of his fellowman. They are the springs of business, trade and commerce. Without them, society could not go on. Spotless faith in their fulfillment honors alike communities and individuals."

While this is true we feel that the fervid eloquence of an orator could not in too earnest terms plead the justness of the demand of the citizen, that each integral part of the State shall bear its fair proportion of the burdens of the State. The one who seeks to show that it is just to grant the privilege of exemption from taxation except in consideration of a public service has assumed a vast undertaking.

That State which refuses to surrender one of its attributes of sovereignty, the power to impose taxes on corporations or individuals, demonstrates its regardful care of the rights of its citizens and manifests its purpose to preserve its existence. When the State has in express terms declined to surrender any part of its sovereignty and seeks to exercise its prerogative, we are unable to see the slightest foundation for the imputation of bad faith.

From the Dartmouth College case to the present time the Supreme Court of the United States has uniformly held that whenever the Legislature granting the charter reserved the right to amend or repeal it, either by so providing in the charter or by a general law, the right to amend or repeal

such charter exists, and to do so is not to impair the obliga-
tion of a contract; the charter being accepted with the full
understanding that the right of repeal is part of the con-
tract, and to the exercise of which right the grantee has con-
sented.

Many of the States, after the Dartmouth College case, be-
gan to realize the importance of reserving the right to con-
trol corporate organizations which from time to time were
being created, and to make sure such power was being re-
served, they passed general laws expressly reserving such
powers, which statutes became a part of every act of incor-
poration as fully as if written therein, unless a different pur-
pose was therein plainly expressed.

The Legislature of this State, being fully aware of the im-
portance of such action as would reserve the right to amend
or repeal acts of incorporation, passed what is known as
the statute of 1856, which is section 8, chapter 68, General
Statutes.

It seems so plain that charters and grants since the 14th
of February, 1856, are subject to amendment or repeal at
the will of the Legislature, unless a contrary intent is plain-
ly expressed therein that it is needless to discuss it.

The Supreme Court of the United States has not only so
held, but this court has done likewise in every case that has
been before it.

Acts of the character of the act of 1856 have uniformly
been adjudged to be a condition upon which every charter
of a corporation subsequently granted was held, and upon
which every amendment or modification was made, and to
be as much a part of the charters as if incorporated into

them.  Any other interpretation would render the statute inoperative and wholly deprive it of its power to accomplish the purpose of its enactment.

In 1841 South Carolina passed a statute substantially the same as the statute of 1856.  The Southeastern Railroad Co. was incorporated in 1851.  In 1855 an act was passed to amend its charter, the amendment exempting the railroad company from taxation.  In 1868 the State adopted a new Constitution, in which it was declared that the property of the corporations then existing or thereafter created should be taxed.  The Legislature of the State passed an act to enforce that provision of the Constitution.

The question involved in Tomlinson v. Jessup, 15 Wallace, 454, was as to the enforcement of such legislation.  Justice Field, in delivering the opinion of the court in the case, said: "It is true that the charter of the company, when accepted by the corporators, constituted a contract between them and the State, and that the amendment, when accepted, formed a part of the contract from that date, and was of the same obligatory character; and it may be equally true, as stated by counsel, that the exemption from taxation added greatly to the value of the stock of the company, and induced the plaintiff to purchase the shares held by him; but these considerations can not be allowed any weight in determining the validity of the subsequent taxation.  The power reserved to the State by the law of 1841 authorized any change in the contract as it originally existed or as subsequently modified or its entire revocation.  The original corporators or subsequent stockholders took their interests with knowledge of the existence of this power and of the probability of its exercise

at any time in the discretion of the Legislature.   The object
of the reservation, and of similar reservations in other char-
ters, is to prevent a grant of corporate rights and privileges in
a form which will preclude legislative interference with their
exercise if the public interest should at any time require such
interference.   It is a provision intended to preserve to the
State control over its contracts with corporators which, with-
out that provision, would be irrepealable and protected from
any measures affecting its obligation.

"There is no subject over which it is of greater moment
for the State to preserve its power than that of taxation.
Immunity from taxation, constituting in these cases a part
of the contract with the government, is, by the reservation
of power such as is contained in the law of 1841, subject to
be revoked equally with any other provision of the charter
whenever the Legislature may deem it expedient for the
public interests that the revocation shall be made.

"The reservation affects the entire relation between the
State and the corporation, and places under legislative con-
trol all rights, privileges and immunities derived by its char-
ter directly from the State."

The same doctrine is enunciated in Railroad v. Maine, 96
U. S., 499; Railroad Co. v. Georgia, 98 U. S., 359; Hoge v.
Railroad Co., 99 U. S., 348; Greenwood v. Freight Co., 105
U. S., 13, 21; Spring Valley Water Works Co. v. Schotler,
110 U. S., 347-352; Close v. Greenwood Cemetery Co., 107 U.
S., 466-476; Louisville Gas Co. v. Citizens Gas Co., 115 U. S.,
683-696; Gibbs v. Consolidated Gas Co., 130 U. S., 369-408;
Sioux City Street Ry. Co. v. Sioux City, 138 U. S., 98-108.

It was said in Hamilton Gas Light Co. v. Hamilton, 146

U. S., 271: "This reservation of power to alter or revoke a grant of special privileges necessarily became a part of the charter of every corporation formed under the general statute providing for the formation of corporations. A legislative grant to a corporation of special privileges, if not forbidden by the Constitution, may be a contract; but where one of the conditions of the grant is that the Legislature may alter or revoke it, a law altering or revoking, or which has the effect to alter or revoke, the exclusive character of such privileges, can not be regarded as one impairing the obligation of the contract, whatever may be the motive of the Legislature, or however harshly such legislation may operate, in the particular case, upon the corporation or parties affected by it. The corporation by accepting the grant subject to the legislative power so reserved by the Constitution, must be held to have assented to such reservation. In Greenwood v. Union Freight Co., 105 U. S., the question was as to the scope and effect of a clause in a general statute of Massachusetts, providing that every act of incorporation passed after a named day, 'shall be subject to amendment, alteration or repeal, at the pleasure of the Legislature.' This court, referring to that clause, said: 'Such an act may be amended; that is, it may be changed by additions to its terms, or by qualifications of the same. It may be altered by the same power and it may be repealed. What is it that may be repealed? It is the act of incorporation. It is this organic law on which the corporate existence of the company depends which may be repealed, so that it shall cease to be a law; or the Legislature may adopt the milder course of amending the law in matters which need amendment, or

altering it when it needs substantial change. All this may be done at the pleasure of the Legislature. That body need give no reason for its action in the matter. The validity of such action does not depend on the necessity for it, or on the soundness of the reason which prompted it.' The words, 'at the pleasure of the Legislature,' are not in the clauses of the Constitution of Ohio, or in the statutes to which we have referred. But the general reservation of the power to alter, revoke or repeal a grant of special privileges, necessarily implies that the power may be exerted at the pleasure of the Legislature."

It must be conceded, from the authorities cited, the Supreme Court of the United States has repeatedly held that the legislatures of the States have the power, when reserved in the charter or by general law, to change or repeal acts granting corporate privileges or franchises. The decisions of this court are in accord with these opinions.

The case of Griffin v. Kentucky Insurance Co., 3 Bush, 592, has been quoted with approval in the case of Louisville Water Co. v. Clark, 143 U. S., 14, and in that case the court held that in all cases of charters or grants of corporate franchises, where the intention of the Legislature was not "plainly expressed" not to exercise the power reserved by the statute of 1856 to amend or repeal, at the will of the Legislature, such charters or grants must be read as if all the provisions of the act of 1856 were incorporated in them.

Judge Robertson, in delivering the opinion in Griffin v. Kentucky Insurance Co., 3 Bush, 595, said: "Then was the general reservation of power, like a special reservation in the charter itself, a part of the contract; or was the contract

made subject to it and the obligation defined or modified by it? We think so. And whatever might be thought of the policy of such legislation, or of the policy or justice of the repealing statute over which the judiciary has no jurisdiction, our conclusion as to the mere power of repeal is, as we think, sustained by reason and abundant authority.

"All contracts, except such as are municipal, are made subject to law, and their obligation is defined by the *lex loci contractus*.

"Why should the contract in this case be excepted? Such exception would be unreasonable, and the authorities fortify the reason."

In the case of Cumberland & Ohio Railway Co. v. Barren County Court, 10 Bush, 604, in reference to the act of 1856, the court said: "The act was intended to preserve to the State control over all acts of incorporation thereafter passed. Experience had demonstrated the propriety of if not the absolute necessity for such a reservation of power, and it would be a manifest disregard of the clearly expressed will of the Legislature for the courts to resort to technical rules of construction or finely-drawn legal implications to escape the effect of the plain declaration that all charters of and grants to corporations shall be subject to amendment and repeal 'unless a contrary intent be plainly expressed.' "

We conclude that the Legislature in 1886, when it passed the revenue bill, had the right to amend or repeal at will all charters and grants of or to corporations or amendments thereof enacted or granted since the 14th of February, 1856, "unless a contrary intent was plainly expressed."

The national banks were subject to have the same tax imposed on their shares of stock as are imposed on State banks doing business under charters granted since the 14th of February, 1856.   Their real estate is subject to taxation. Their shares of stock may be taxed at their actual value, but no greater rate of taxation shall be collected on them than is assessed upon the moneyed capital in the hands of individual citizens of the State.

In the case of the Covington City National Bank v. City of Covington, &c., 21 Federal Reporter, 491, Justice Matthews, discussing this subject, said: "When, therefore, a statute taxes the shares of a stockholder at their actual or market or full value, that necessarily includes such value beyond its par or nominal value as is imparted to the stock by the fact that the bank has a surplus fund or undivided profits."

The interest which Congress has left subject to taxation by the States under the limitations prescribed, and which is a distinct, independent interest in property held by the shareholder, like any other property that may belong to him, is that interest, as defined in Van Allen v. the Assessors, 3 Wall, 573, which "entitles him to participate in the net profits earned by the bank in the employment of its capital during the existence of its charter in proportion to the number of its shares, and,   upon its dissolution or  termination, to his proportion of the property that may remain of the corporation after the payment of his debts, and (page 587) it includes for taxation the whole interest of the shareholder, such as would pass to the purchaser of the share on a transfer of his certificate.   So, when a State law taxes shares of a national bank stock, it taxes the same interest of the

shareholder that he would transfer on a sale. The State may tax them at their actual or at their market value, or at any other rate of appraisement which does not violate the act of Congress."

To the same effect are the cases of People v. Commissioners of Taxes, 94 U. S., 415; Mercantile Bank v. New York, 121 U. S., 138.

In the latter case the court said (page 155): "The main purpose, therefore, of Congress in fixing limits to State taxation on investments in the shares of national banks was to render it impossible for the State, in levying such a tax, to create and foster an unequal and unfriendly competition by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy."

The Legislature of Pennsylvania passed a statute taxing the shares in national banks on an assessed value thereof for county, school, municipal and local purposes. The Supreme Court, in Hepburn v. The School Directors, 23 Wallace, 480, held the statute valid.

It has been decided that it is competent for the States to tax the shares of national bank stock, notwithstanding the capital of the bank was invested in bonds of the United States which were not subject to taxation. National Ban'. v. Commonwealth of Kentucky, 9 Wallace.

The national banking law does not prevent the State from taxing stock in national banks at a higher rate than that imposed on the most favored banks operating under the laws of the State.

This question was fully determined in Lionberger v. Rouse, 9 Wallace, 468. The court said: "It is very clear that Congress, in conceding to the States the right to tax, adopted a measure which, it was supposed, would operate to restrain them from legislating adversely to the interests of the national banks. The measure itself had reference to prospective legislation by the States, and its object was accomplished when the States conformed, as far as practicable, their revenue systems to it. Exact conformity was required, if attainable, but the law-making power did not intend such an absurd thing as that the power of the State to tax should depend on its doing an act which it had obliged itself not to do. It was well known at the time, and Congress must be supposed to have legislated on this subject with reference to it, that States, by contract with individuals or corporations, could grant away the right of taxation, and that this power had been frequently exercised. It was equally within the knowledge of Congress that the policy on this subject varied in different States, while some of them retained in their own hands the power of taxation over all species of property, except such as were devoted to religious or charitable purposes, others had parted with it to interests of a purely business character, like banks and railroads. Can it be supposed that Congress, with this condition of things in the country, meant to confer a privilege by one section of a law which, by another, it made practically unavailable? If the construction contended for by the plaintiff in error be allowed, then a State so unfortunate as to have a single bank, whose shareholders are exempt by contract from taxation in

[13]

the manner provided by Congress, can derive no benefit from the power given to tax the shares of national banks. And this further consequence would follow, that the shareholders of national banks located in one State would escape all taxation, while those whose property was invested in banks in a different locality, would have to contribute their full share of the public burdens. This court will not impute to Congress, a purpose that would lead to such manifest injustice, in the absence of an express declaration to that effect. Without pursuing the subject further, it is enough to say, in our opinion, Congress meant no more by the second limitation in the proviso to the forty-first section of the national banking act, than to require of each State, as a condition to the exercise of the power to tax the shares in national banks, that it should, as far as it had the capacity, tax in like manner the shares of banks of issue of its own creation."

The court should endeavor to ascertain the legislative intent in the act of 1886 with reference to the taxation of banks, as all depends in this controversy upon what was that intent. To aid in reaching a conclusion as to what the intent was, it is well to recall some official facts within the knowledge of the members of the Legislature.

The 1st of July, 1885, was the date of the last report of the capital stocks of the banks in the State before the enactment of the revenue law of 1886. From that it is learned that the capital stock of the fifty-nine national banks amounted to $9,708,900. The capital stock of the sixty-five State banks, doing business under charters granted subsequent to 1856, amounted to $6,224,891. The capital stock of the

four State banks—Farmers' Bank of Kentucky, Bank of Kentucky, Northern Bank and the Bank of Louisville—incorporated prior to 1856 was $5,144,500.

It will be seen from this statement that the capital stock of the national banks and of the State banks chartered since 1856 amounted in round numbers to $16,000,000, while the capital stock of banks whose charters antedate 1856 amounted to about $5,000,000, being less than one-third of that of the other banks named.

It must be presumed that the Legislature knew that the banks claiming irrevocable contracts to pay only fifty cents on each share of their capital stock equal to one hundred dollars paid less than one-third of the revenue coming from the banks under the then existing law.

It can hardly be said that the Farmers' Bank of Kentucky was in a condition to claim an irrevocable contract because the act extending its charter, which became a law on March 10, 1876, expressly reserved the right to amend or repeal its charter and amendments thereto. It reads as follows: "That the charter of the Farmers' Bank of Kentucky, as amended, be extended for a period of twenty-five years from the termination of its charter as therein fixed: Provided, That said charter and amendments shall be subject to amendment or repeal by the General Assembly, either by general or special act: And provided further, That whilst the privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested."

To simply quote the act extending the charter is a sufficient denial of and answer to the claim of an irrevocable

contract. This left but three banks in the State which could claim an irrevocable contract, and one hundred and twenty-five without any claim whatever to immunity against increased taxation.

The revenue act repealed several acts by particularly naming them and excluded certain other acts from the repealing clause, and declared all other acts, general and special, and parts of acts inconsistent or not in conformity therewith, were thereby repealed. Chapter 92, General Statutes, contained the revenue law. The only part of the act relating to the taxation of banks and other institutions of loan or discount is article 2, chapter 92, General Statutes. Section 1 of the article relates to the amount of tax which the banks shall pay, and designating the method of levying the tax. Section 2 imposes certain duties on the cashier of the bank with reference to making a report to the auditor of public accounts. Section 3 exempts banks having certain money invested in bonds or funds of the United States from taxation named in the section.

By the terms of section 7, if the banks failed or refused to make the consent and agreement as provided in section 4, then they are to be assessed and the same tax, State, county and municipal, shall be imposed, levied and collected, etc., as is imposed on the assessed taxable property in the hands of individuals.

Without section 4 the remaining sections of the article would have been a complete system for levying and collecting taxes on the banks chartered after 1856. The article treats of nothing except the taxation of banks.

Under section 4 the banks were asked to waive and release

all rights under the acts of Congress or under the charters of the State banks to a different mode or smaller rate of taxation

The national banks were subject to the payment of taxes for State, county and municipal purposes, and it was not necessary to obtain their consent that they might be taxed for that purpose. It was needless to ask this class of banks to enter into the agreement.

The Legislature may have entertained some doubt, not as to the right to tax banks for State, county and municipal purposes, but as to the method prescribed and desired to remove all doubt by obtaining the consent of such banks to that method. It was greatly to the interest of the national banks and the State banks chartered subsequent to 1856 to enter into the agreement because they were thus released from the payment of county and municipal taxes.

In agreeing to pay the amount provided in the article for State purposes they were released from local burdens which in some instances are two or three times as great as that which they agreed to pay the State. It was greatly to their interest to accept the proposition of the State.

As a matter of fact these banks were relinquishing no rights. They were apparently yielding a right which the State, in its sovereignty, already possessed. The right had never been relinquished, but had been expressly reserved. So vigilant had been the State to retain the control of corporations, and retain its power to tax them, its purpose to do so was declared in the form of a legislative enactment, which was understood to be written in every act of incorporation.

It may be a more difficult task to show why the three old banks entered into the agreement. Their right to the immunity from increased taxation was questioned, as shown by the revenue act, as their charters were declared repealed so far as they were inconsistent therewith.

It was the evident purpose of the Legislature to induce these banks to recede from their claim to an irrevocable contract. It was desired that all banks should be placed upon the same footing in the matter of taxation with the other banks of the State. The Legislature had been renewing their charters, and if they were again renewed an appeal must be made to the same power. These banks may have realized that the act of 1856 should have, by a proper interpretation, been made applicable to the acts renewing their charters. However, it is needless to speculate further as to the reason which induced them to enter into the contract with the State by which they released any irrevocable contract which they had under their charter against increased taxation. These banks had the right to give their consent to the increased taxation.

The courts had always recognized the right of a corporation to consent to legislation or accept its provisions and be bound thereby though it may have the effect of depriving such corporation of a vested right. This brings us to the question as to what were the terms and conditions of the contract into which all these banks entered. The banks must be presumed to know the law and the effect of the contract to which they agreed. Those who represent banks are among the brightest and most sagacious business men of the country. The law is brief, simple and without am-

biguity.   In short the State agreed to accept and the banks agreed to pay seventy-five cents annually on each share of their stock equal to one hundred dollars, and, in considera- tion thereof, be exempt from all other taxation whatsoever so long as this tax shall be paid during the corporate exist- ence of such bank.   If these were all its terms, then it might be contended with some reason that it was irrepealable dur- ing their corporate existence.

Being mindful of the policy which had been pursued for thirty years, it said in effect to the banks it is desired that the statute shall be accepted in the formal way prescrib- ed, but it must be understood that the right to alter or change it is reserved to the State.   That its purpose might be fully understood, the Legislature placed in the article section 6, which in terms makes the statute of 1856 a part of the con- tract.

It is expressly provided that the article shall be subject to the provisions of section 8, chapter 68, General Statutes. The Legislature was determined that the provisions of the act of 1856 should not depend on rules of construction to be read into the contract by implication, but in terms said that it should be part thereof.   It is admitted that when the word "act" appears in article 2 it has reference to the article (2).   Article 2 was an independent measure, offered as a substitute to article 2 of the original bill.

The substitute was adopted and became a part of the reve- nue bill.   It now appears as part of the bill in the exact lang- uage as offered.   This section 6 has no reference to any part of the revenue bill except the article of which it is a part. It has been suggested that it had reference to new banks that

might be organized. This could not be so because article 2 is dealing with banks in existence, and asks them to give their consent, etc., thereto, and says, if at all, they must do so before the meeting of the next General Assembly.

When it was admitted that the word "act," as used, is synonymous with "article," then it must be admitted that the provisions of section 6 of article 2 are applicable alone to the article (2) of which it is a part. If there could be any doubt from the language used as to the meaning of the Legislature, then that must be removed by an examination of the House and Senate Journals.

An amendment (page 1241, House Journal, 1886) was offered to article 2 of the original revenue bill, and section 7 of that amendment reads as follows: "This act shall not be subject to the provisions of section 8, chapter 68 of the General Statutes." The amendment (page 1243 House Journal, 1886) was defeated.

While the revenue bill was pending in the Senate it was proposed to amend section 6 of article 2 by inserting after the word "shall" in the first line the words "not for ten years" (page 1315, Senate Journal, 1886). This amendment was defeated. Had it been adopted, then the section would have read: "This act shall not for ten years be subject to the provisions of section 8, chapter 68 of the General Statutes."

The proceedings of the House and Senate show the Legislature fully understood the purpose for which this section was made part of article 2. It was the purpose of the Legislature not to be restricted for any period of time in its right to repeal the article and withdraw from the contract.

In view of the plain provision of the statute about the

meaning of which there should be no doubt, and the intent of the Legislature being fully explained by its record, it seems to us there should be no hesitation in concluding the act of 1856 should be read as part of the statute, hence an irrevocable contract does not exist. The fact that a written consent was asked and secured does not alter the application of the act of 1856.

The act of 1856 should be read as part of the act of 1886, even if it had not been referred to as part of it.

In Louisville Water Company v. Clarke, 143 U. S., 10, this rule of construction was recognized. The court said: "But, in respect to all the acts passed after 1856, amending the charter of or relating to the water company, including that of 1882, each must be read as if all the provisions of the act of 1856 were incorporated in it, because in no one of them is plainly expressed an intent to waive the right of amendment or repeal at the will of the Legislature." Greenwood v. Freight Co., 105 U. S., 20, is to the same effect.

New Jersey v. Yard, 95 U. S., 104, is cited by counsel for appellees and also by counsel for appellants. The facts of that case were as follows: The Morris & Essex Railroad Co. was created a corporation by an act of the Legislature of New Jersey passed January 29, 1835. The act provided that as soon as the net proceeds of the railroad amounted to seven per cent. on its cost it should pay a State tax of one-half of one per cent. on the costs of the road, and no other tax should be levied upon it. The twentieth section reserved to the Legislature the right to amend or repeal the act whenever it should think proper. A supplemental act was passed on March 2, 1836, in which the right to repeal or amend was reserved

On the 14th of February, 1846, the Legislature of New Jersey passed an act in effect the same as the Kentucky act of 1856. Another supplemental act to the charter of the railroad was approved March 23, 1865, authorizing a branch road to be built, and by which the company was vested with all the powers and franchises given by original and supplemental act, etc. The third section of the last-named act reads as follows: "Be it enacted that the tax of one-half of one per cent. provided by this said original act of incorporation to be paid by the said company to the State whenever the net earnings of the said company amount to seven per cent. upon the cost of the road shall be paid at the expiration of one year from the time when the road of the said company shall be open and in use to Phillipsburg, and annually thereafter, which tax shall be in lieu and satisfaction of all other taxation or imposition whatever, by or under the authority of this State or any law thereof: Provided, That this section shall not go into effect or be binding upon the said company until the said company, by an instrument duly executed under its corporate seal and filed in the office of the secretary of State, shall have signified its assent thereto, and which assent shall be signified within sixty days after the passage of the act, or this act is void."

The instrument required by the section was duly executed by the company. In the act of 1865 there was no reservation of the right to repeal or amend it. Acts of the Legislature imposed more burdensome tax on the railroad company than that provided for in section 3, *supra*. The sole question in New Jersey v. Yard was whether the act of 1865 and its acceptance by the railroad company constituted

a contract which could not be impaired by any subsequent Legislature of the State.

The court held that it was an irrevocable contract because the Legislature had not reserved the right to amend or change it. It is plain from the opinion that had the Legislature reserved the right to alter or change the contract, or act by which it was made, the court would have held the act of the Legislature doing so did not impair the obligation of the contract. Justice Miller, in delivering the opinion, said: "But, as we have already said, since the Legislature which passed the act of 1865 had the power to make a contract which should not be subject to repeal or modification by one of the parties to it without the consent of the other, the main question here is, did they intend to make such a contract? *    *  In the case now under consideration it is conceded on all hands that the act of 1865 was a contract for a tax of one-half of one per cent. per annum on the cost of the Morris & Essex railroad and no more. But counsel for defendant says the contract was repealable; that the Legislature, of its own volition, could impose other and more burdensome taxes at its discretion; that it was a contract so long as the Legislature of New Jersey was satisfied with it and, no longer. It is conceded also that the construction of it can not be sustained unless we are bound to import into it either the reservation clause of the act of 1836, or what is called the interpretation act of 1846.

"We have already shown how little reason there is for doing this on general principles of construction. We think it still clearer that it can not be done because it is inconsistent with the legislative intent in passing the act of 1865.

\* \* The implication is of a right to revoke it, and comes from the other quarter, and is one which we do not think exists by fair construction, and which we do not feel at liberty to import into the contract to defeat its manifest purpose."

From the language of this opinion, and the long line of decisions of the same court, it is manifest that the decision was made to turn on the question of the reservation of the right to amend or repeal, etc.

In New Jersey v. Yard the court held the act was invalid because the right to repeal or modify had not been reserved. In these cases we are asked to hold the organic and statutory laws invalid because the right to repeal or modify was reserved in express terms.

By the very terms of the act of 1856, a rule of interpretation is given that "all charters and grants of or to corporations or amendments thereof and all other statutes" shall be subject to amendment or repeal at the will of the Legislature unless a contrary intent be therein "plainly expressed."

It is proposed now by those representing the banks to disregard this statutory rule of construction. It is now in effect insisted that in order to reserve the right claimed it must be "plainly expressed" in the act that it is reserved; this being done, it is still disregarded. The Legislature. doubtless anticipating such contention and versatility, "plainly expressed" in the article that whatever was done thereunder or in pursuance thereof could only continue during its will. If section 6 was not for this purpose, we would like to have had some one suggest some reason as to why it was placed in the article. The doctrine is that when it is asserted that a State has bargained away her right of tax-

ation in a given case the contract must be clear and can not be made out by dubious implication. (New Jersey v. Yard, *supra*.)

Chief Justice Taney, delivering the opinion of the court in Ohio Life Insurance & Trust Company v. Debolt, 16 Howard, 425, gave a rule of construction as follows: "The rule of construction in cases of this kind has been well settled by this court. The grant of privileges and exemptions to a corporation are strictly construed against the corporation, and in favor of the public. Nothing passes but what is granted in clear and explicit terms. And neither the right of taxation nor any other power of sovereignty which the community had an interest in preserving undiminished, will be held by the court to be surrendered, unless the intention to surrender is manifested by words too plain to be mis- taken. This is the rule laid down in the case of Billings v. the Providence Bank, and reaffirmed in the case of the Charles River Bridge Company." The Supreme Court has enunciated substantially the same rule in numerous cases.

The taxing power of the State is never presumed to be re- linquished unless the intention to relinquish is expressed in clear and unambiguous terms. (Bradley v. McAtee, 7 Bush, 667.)

It is a familiar rule of construction of statutes that effect must be given to every provision except in cases of absolute and irreconcilable incongruity. (Dazey v. Killam, 1 Duval, 407.)

If one statute refers to another for the power given by the former the statute referred to is to be considered incorpor- ated in the one making the reference. (Numes v. Wellisch, 12 Bush, 365.)

Mr. Cooley, in his work on Taxation, page 204, says: "As taxation is the rule and exemption the exception, the intention to make an exception ought to be expressed in clear and unambiguous terms; and it can not be taken to have been intended when the language of the statute on which it depends is doubtful or uncertain."

For the interpretation of statutes this court, in Nicholas v. Wells, Sneed, 259, said that "the most natural and genuine way of construing a statute is to construe one part by another part of the same statute; that the words and meaning of one part of a statute do frequently lead to the sense of another; and if it can be prevented no clause or sentence or word shall be superfluous, void or insignificant."

As there is a clear expression of the legislative intent in the statute, no rules are really necessary to aid in its interpretation.

It can hardly be said it was unwise on the part of one hundred and twenty-five of the one hundred and twenty-eight banks in the State, as by the very terms of the act under which the contract was entered into they were required to pay State, county and municipal taxes, with the power in the Legislature to increase it at will.

It certainly was a very advantageous contract for them to enter into when these banks paid more than two-thirds of the taxes paid by all the banks, with the power in the Legislature to increase the amount if they should so desire. What reason can be suggested as to why the Legislature would desire to reverse the policy which had been steadfastly adhered to for so long and enter into an irrevocable con-

tract with such banks? Why should it want to surrender a power which it had been so zealous to preserve?

The contract was made subject to the right of the Legis-lature to withdraw from it whenever it regarded the public interest demanded it should do so.

Whenever the banks accepted the provisions of the act of 1886 they surrendered any rights to immunity from in-creased taxation which their charters gave them.

The acceptance of the act of 1886 was a consent to the repeal of so much of their charters as were inconsistent there-with. Hence they stood in such relation to the State as to future taxation as the Legislature saw proper to impose. If the provisions of their charters relating to taxation were repealed, as it must be admitted they were by the act of 1886, then such provisions were no longer in force. It is unreasonable to say that the provisions of the charters fix-ing the rate of taxation on the banks at fifty cents on each share of the capital stock of the banks equal to one hundred dollars can be in force if the act of 1886 fixing such tax at seventy-five cents instead of fifty on shares is in force. In doing this it must be admitted the charter privilege has been repealed. If repealed, then, by the act of 1886, surely the only way in which the provisions of their charters could be restored would be by the Legislature so providing in some act. There is no pretense this has been done. The fact that the law of 1886 has been repealed does not restore the former provisions of their charters.

Section 464, Kentucky Statutes, provides: "When a law which may have repealed another shall be repealed the previous law shall not be revived unless the law repealing it

be passed during the same session of the General Assembly."

It is a most groundless contention to say that if the present law is sustained that the old banks will be restored to the former privileges under their charters.

It has been suggested that the provisions of their charters with reference to taxation were vested rights, and although they consented to the legislation of 1886 and became subject to the provisions of the act of 1856, still as the charter privilege as to taxation was a vested right, therefore, it was saved to them by the provision which preserves "other rights previously vested."

The proviso of the act of 1856 is "that whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested."

If a corporation, by its charter or a general law is exempted from the payment of taxes, it is released of a duty or burden. It enjoys an immunity of exemption from a general law, which imposes the burden of the government on others. It may be said it enjoys a privilege.

"Franchise is a branch of the king's prerogative subsisting in the hands of a subject." (2 Sharswood, Blackstone, Com., 37.)

The Legislature has reserved the right to amend or repeal the privileges and franchises, thus reserving the power to destroy or qualify the privileges and franchises which have been granted.

The "other rights" which have become vested while operating under the charter, can not be impaired by an amendment or repeal. These "other rights" do not embrace

"privileges and franchises." The "privileges and franchises"
are the rights bestowed by the State, to be withdrawn or
destroyed at the pleasure of the Legislature. In the exer-
cise of its pleasure the Legislature may fix a higher rate of
taxation, or it may declare to those enjoying the franchise
that they shall no longer have it. Privileges and franchises
are not "vested rights," either in the letter or spirit of the
act of 1856.

"Other rights" referred to in that act are such as the
beneficiaries under the charter or general laws may have
in property, contracts, choses in action, real and personal
property, in fact, every interest which they could acquire in
operating under the charter or law, and also such rights or
interests as other persons may have previously acquired by
contracts, mortgage, judgment or otherwise in property be-
longing to the corporations.

The purpose of the act of 1856 was to reserve in the Legis-
lature the power to destroy the privileges and franchises
granted in the charters. If it does not have this effect it
would be entirely inoperative, and the effort to retain control
of corporations would be abortive. The claim that the priv-
ileges granted by article 2 can be repealed, but without the
right to terminate their enjoyment is not founded in reason.
The only privilege which the banks enjoyed was to pay the
seventy-five cents on each share of stock in lieu of all other
taxes. To say that the law granting the privilege can be
repealed, because the right to do so was reserved, as is ad-
mitted, and still leave the banks in its enjoyment (as is the
effect of the opinion of the court in the Bank Tax Cases), is

[14]

to disobey a plain statute, to ignore the authority of the opinions of the Supreme Court, and is a failure to follow sound reasoning in the settlement of a question of vast importance to the State and the people. The former opinion on this question gave the banks the substance and the State the shadow. Had section 6 of article 2 provided that the act of 1856 should not be considered part of it, we do not doubt the representatives of the banks would have easily seen the meaning of the provision. As it is plainly written that the act of 1856 is to be considered a part of the article, they have the very greatest difficulty in seeing the purpose of the provision.

It was said in Griffin v. Kentucky Insurance Co., 3 Bush, 594, "the proviso was intended to secure the right of beneficiaries and others vested under the charter before its amendment or repeal, and does not affect the mere power to repeal the franchise."

To the same effect is the Cumberland & Ohio R. R. Co. v. Barren County Court, 10 Bush, 600. Section 174 of the Constitution recognized a just principle when it declared that all property, whether owned by persons or corporations, should be taxed in proportion to its value unless exempted thereby, and that all corporate property should pay the same rate of taxation paid by individual property.

The Legislature, in obedience to that provision of the Constitution, enacted the law for levying and collecting tax from the banks of the State, the validity of which is in question in these cases.

For the reasons already given, we conclude that the ob-

ligations \of no contracts were impaired by the action of the Constitutional Convention or the succeeding Legislature.

Some of the best lawyers in the State were members of the convention which framed our Constitution, who gave an earnest consideration to the questions involved in these cases, and the conclusions which they reached were crystallized into section 174 of the Constitution. We believe that their con-. clusions are correct.

The former opinion of the court denies the power is in the Legislature to say what taxes the banks of the State shall pay for State purposes during the existence of their several charters. It denies the right of the Legislature to compel them to bear any of the burdens of county and municipal government.

We can not believe the Legislature did or intended by article 2 of the act of 1886 to reverse its policy so earnestly pursued for a generation and surrender to sixty odd banks of the State its right, previously reserved, to control them in the matter of taxation, and to give up its power to increase or diminish the taxes imposed on one hundred and twenty-five banks, this including the national banks.

Exigencies may arise requiring the levying and collecting of vast sums to meet the public demand, yet, however great the emergency may be or imperative the demand for money to meet such wants, the Legislature is powerless to compel the banks to contribute more than they are now paying at any time during their corporate existence.

The counties and municipalities are annually compelled to raise large sums of money by taxation. The counties of the State are compelled to incur large expense to support the

county governments, to pay for bridges and public highways and support their unfortunate citizens. The municipalities must incur great expense in making all necessary improvements for the comfort, safety and health of their citizens, to supply water and lights and to give police protection to their citizens and to the banks.

The organic and statutory law of the State, in our opinion, require that the banks should contribute their proper share of such expenses to the local governments.

In Franklin County Court, etc., v. Deposit Bank of Frankfort, etc., 87 Kentucky, the court adjudged that there was a broad distinction between the extension of a charter and the grant of a new one. This is true in a certain sense. To extend a charter requires a statute to be enacted, and which grants certain rights to the corporation.

Under the act of 1856 all statutes, and also grants to corporations, are subject to amendment or repeal. All acts granting extensions to the charters of corporations, since the 14th of February, 1856, are as much subject to amendment or repeal as are acts of incorporation passed since that date.

In so far as the case of Franklin County Court, &c., v. Deposit Bank of Frankfort, &c., 87 Ky., 370, is in conflict with this opinion, it is overruled. (Shields v. Ohio, 95 U. S., 323; Railroad Co. v. Maine, 96 U. S., 503; Commonwealth v. Masonic Temple Co., 87 Ky., 349.)

There are many national and State banks organized since the passage of the Hewitt bill. They certainly can not claim, with any degree of reason, that they have any, much less an irrevocable, contract with the State. If there could have been any doubt on the question, it is removed by the case

of the Bank of Commerce v. Tennessee, &c., 163 U. S., 416. If the banks which accepted the Hewitt law are to be exonerated from the payment of county and municipal tax, then during the existence of their respective charters the burdens placed upon the banks is not equal and just. In the same city or town we will have part of the banks paying county and municipal tax, whilst others have immunity from such burdens.    It will greatly increase the value of the stock of the banks enjoying special privileges, whilst it will necessarily render less valuable stock in the banks which have the burden of a share of county and municipal taxes.

It will be a check on the organization of new banks.    It will give the favored banks a monopoly of the business in their respective communities.    The effect would be an unjust and an unwarranted discrimination.

It was seriously argued in the former opinion of the court that the enforcement of the Constitution and laws will diminish the revenues of the State government.    With this we have nothing to do.    It is our business to obey the Constitution and respect the statutes enacted in accordance therwith.    Were this a question of policy involved, it is not considered a great task to vindicate its wisdom.    While more of the citizen's tax will go to support the State government, yet he is trebly compensated by the banks contributing their fair share of county and municipal taxation,. and thus reducing the amount which each citizen will be required to pay to sustain the local governments.

The cases of the Deposit Bank of Owensboro, Farmers' & Traders' Bank, Owensboro Savings Bank, Citizens' Savings Bank v. City of Owensboro, &c.; Deposit Bank of Owensboro

v. Daviess County; Simpson County Bank v. City of Frank-
lin, are affirmed, and the cases of City of Carlisle v. Deposit
Bank of Carlisle; Nicholas County v. Deposit Bank of Carlisle
and City of Carlisle v. Farmers' Bank are reversed, with di-
rections that further proceedings conform to this opinion.

Judges Burnam and Hazelrigg dissent. Judge DuRelle
dissents, delivering separate dissenting opinion.

JUDGE PAYNTER DELIVERED THE FOLLOWING EXTENSION OF THE
OPINION, ON MARCH 25, 1897:

The banks are not required to pay tax on the money de-
posited with them by their customers, or on assets which
represent it. Owing to the particular character of the busi-
ness which they conduct, they are *quasi* trustees of their de-
positors, and under the law the depositors are required to
pay the tax on the money so deposited. The bank should be
required to pay tax on the shares of capital stock, on their
surplus funds, undivided profits, franchises and their real
estate.

JUDGE DuRELLE DELIVERED THE FOLLOWING DISSENTING OPIN-
ION, MARCH 24, 1897:

Assuming that I should differ from the former opinion of
the court, if the construction sought upon these appeals were
an original question now for the first time presented for de-
cision, and that the meaning of the constitutional and stat-
utory provisions under consideration is so plain that I should
do so without regard to argument drawn from real or sup-
posed inconvenience, which might result from my construc-
tion, I am nevertheless constrained to dissent from the pres-
ent opinion. The case is not, in my judgment, one in which
a former erroneous decision upon a question of taxation is
sought to be over-ruled by the court as to taxes assessed

for subsequent years; nor do I intend here to express an opinion upon that class of cases.

The original opinion now overruled by the opinion of the court was not a mere question of liability to tax under statute or Constitution. It was a question of contract proprietary right, and was so decided. Having been so decided after elaborate discussion and full consideration—it having been established by that decision that a contract right existed, and property of enormous value having doubtless changed hands upon the strength of the property right so adjudged to exist—this Court should be slow to overturn a decision which has stood, for more than a year and a half, the law of the Commonwealth.

It has been said, and, in general, it is true, that "the certainty of a rule is of more importance than the reason on which it is founded." The rule having been settled, though, in my judgment, not correctly; having been acted upon for a considerable time, I think it should be adhered to until the question is again presented to the court by legislative action or constitutional amendment. Instability in the decisions of a court of last resort with respect to property rights not only leads to an increase of speculative litigation —instituted for the purpose of testing the sentiment of the court as constituted at the time—but directly invites persons and corporations interested in the determination of such questions to undue and improper interference in the selection of judges. In my judgment, the evils to result from the continuance of the incorrect rule are less than those which will result inevitably from the alteration of the rule by a divided court.

These views, which I have stated without elaboration or argument, are sustained by the reasoning of the Supreme Court in Gelp cke v. Dubuque, 1 Wallace, 203, 206; 6 Peters; 299, 300; 16 How., 432.

For these reasons, to the extent that the opinion disturbs rights adjudged by the former opinion to exist, I do not concur in the opinion of the court.